# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **GARY MILLER,** | No. 15-cv-6370 (KM)(MAH) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **THE PORT AUTHORITY OF NEW YORK & NEW JERSEY,** | |
| **Defendant.** | |

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes before the Court on the motion of the defendant, The Port Authority of New York and New Jersey ("Port Authority"), for summary judgment. (DE 63). The motion will be granted.

The plaintiff, Gary Miller, worked for Port Authority at Newark Liberty International Airport ("EWR") for less than three months, from January 2, 2015 until his termination on March 21, 2015. After his termination, Miller sued Port Authority, claiming religious discrimination and failure to accommodate his religious beliefs, in violation of Title VII of the Civil Rights Act of 1964.

Miller observes the Jewish Sabbath, a belief which prohibits him from working from sunset on Friday to sunset on Saturday. There were times when his position at Port Authority required that he work Friday evenings and Saturdays, as part of a neutral rotational schedule. A few days after starting his new position, on January 5, 2015, Miller requested that he not be required to work shifts that conflicted with the Sabbath and Jewish holidays.

Miller claims that his request for an accommodation was rejected. He does not recall, however, whether anyone from Port Authority ever spoke to him about his options to use various forms of leave on days of religious obligation. In contrast, Port Authority has proffered competent evidence that it offered

1

Miller the option to swap shifts with other employees, and told him that he could use vacation, personal excused time, or compensatory time. Miller did in fact use personal excused time for religious purposes on seven occasions from January through February of 2015.

In March of 2015, Miller submitted three separate requests for unpaid leave, which were rejected. By that time, he had exhausted his personal excused time. When he failed to report to work, he was marked absent without excuse. He was subsequently terminated.

Miller contends that Port Authority's accommodation was not reasonable. He offers that Port Authority could simply have altered its rotational schedule and not scheduled Miller on Friday evenings or Saturdays. He further contends that his shift could have been "back-filled" in the same manner as is done for employee absences.

The employees in Miller's unit are unionized, and as a result, Port Authority is bound by a collective bargaining agreement. Creating a permanent shift schedule for Miller exempting him from work on the Sabbath or the Jewish holidays, without first offering that option to more senior employees, would have violated the agreement's seniority provision. It also would have violated the past-practices provision of the agreement, which requires that the established rotational schedule be maintained. In short, Miller's preferred accommodation would have placed Port Authority in violation of its collective bargaining agreement and required other, more senior employees to work less desirable additional Friday evening and Saturday shifts.

On this record, the religious accommodation offered by Port Authority was reasonable. And because the blanket exemption proposed by Miller would have imposed more than a *de minimis* hardship, the employer was not required to accept it.

## I.    FACTS[1]

As required at this stage, the Court resolves all disputes of fact and draws all inferences in favor of Miller. Unless otherwise indicated, the facts recited below are undisputed for purposes of Fed. R. Civ. P. 56.

### A. Unit 329 at EWR

On January 2, 2015, Port Authority hired Miller as a Utility Systems Maintainer ("USM") at EWR. (DSMF ¶5; PRS ¶5). EWR has a Mechanical Maintenance Unit, "Unit 329," that is responsible for the operation, maintenance, and repair of utility systems and related auxiliary equipment. (DSMF ¶9; PRS ¶9). Unit 329 also responds to emergency situations at the airport, including plane crashes, pipe ruptures, water main breaks, or weather-related conditions. (DSMF ¶10; PRS ¶10).

The Manager of Airport Maintenance was Sarah McKeon. (DSMF ¶14; PRS ¶14). Albert Kosakowski, who reported to McKeon, was the Chief Maintenance Supervisor during the relevant time period, and was responsible for the daily management of Unit 329. (DSMF ¶11; PRS ¶11). Kosakowski had five supervisors who reported to him, including Maintenance Unit Supervisor William Lynch. Lynch was Miller's direct supervisor. (DSMF ¶12; PRS ¶12).

---

[1]    I cite to the record as follows:

| | | |
|---|---|---|
| DE __ | = | Docket Entry number in this case; |
| DBr | = | Defendant Port Authority's Moving Brief (DE 65); |
| DSMF | = | Defendant Port Authority's Statement of Undisputed Material Facts (DE 63-1); |
| DRBr | = | Defendant Port Authority's Reply Brief (DE 76); |
| DRS | = | Defendant Port Authority's Reply Statement to Miller's Statement of Disputed Material Facts (DE 76-1); |
| PBr | = | Plaintiff Miller's Brief in Opposition (DE 72); |
| PSMF | = | Plaintiff Miller's Statement of Disputed Material Facts (DE 73); |
| PRS | = | Plaintiff Miller's Responsive Statement to Port Authority's Statement of Undisputed Material Facts (DE 73). |
| Miller Cert. | = | Certification of Plaintiff Miller, filed in response to motion for summary judgment (DE 68-2). |

Unit 329 has fourteen allotted USM positions. (DSMF ¶15; PRS ¶15). Those fourteen USM positions provide essential coverage twenty-four hours per day, seven days a week, 365 days a year. (DSMF ¶¶16, 50; PRS ¶¶16, 50).

The USMs in this unit are members of a union, the International Union of Operating Engineers, and are subject to a collective bargaining agreement. (DE 63-13 (Memorandum of Agreement ("MOA") between The Port Authority of New York and New Jersey and International Union of Operating Engineers, AFL-CIO Local 15, Local 30, and Local 68 (effective Mar. 4, 2002-Oct. 3, 2006)); *See* DSMF ¶27; PRS ¶27).

The MOA incorporates by reference Information Bulletin No. 38, "Seniority." (DSMF ¶38; PRS ¶38; DE 63-19). Four of the fourteen USM positions are designated as "regular day tours," which are offered to the USMs with the most seniority. (DSMF ¶15; PRS ¶15). The regular day tour is a set shift from Mondays through Friday, 7 AM to 3 PM. (DSMF. ¶15).

The remaining ten positions are assigned to a rotating shift schedule. (DSMF ¶16; PRS ¶16). Pursuant to the schedule, for a particular day an employee is assigned to the A shift (11 PM to 7 AM), B shift (7 AM to 3 PM), C shift (3 PM to 11 PM), or the R (relief) shift.

The rotating schedule repeats itself every thirty-five days. (DSMF ¶17; PRS ¶17). That rotational thirty-five-day cycle is as follows:
(1) Seven consecutive working days on the A Shift (11 PM to 7 AM) from Tuesday to Monday;
(2) Two regular days off ("RDO") on Tuesday and Wednesday;
(3) Seven consecutive working days on the C Shift (3 PM to 11 PM), from Thursday to Wednesday;
(4) Two RDOs on Thursday and Friday;
(5) Six consecutive working days on the B Shift (7 AM to 3 PM) from Saturday to Thursday,
(6) RDOs on Friday, Saturday, and Sunday;
(7) Four consecutive days of working the Relief Shift ("R Shift") from Monday to Thursday (7 AM to 3 PM);
(8) B shift on Friday; and
(9) Three RDOs on Saturday, Sunday, and Monday.

(DSMF ¶17; PRS ¶17).

Two USMs are assigned to each A, B, and C shift — one to the central heating and refrigeration plant, and the other to the field. (DSMF ¶¶18, 20; PRS ¶18).

During a two-week period, each USM is scheduled to work no more than eighty hours, and is entitled to four regular days off (RDOs). (DSMF ¶36; PRS ¶36). USMs work not fewer than four but not more than seven consecutive days. (*Id.*). Those consecutive days must be on the same shift (A, B, or C). (*Id.*). The ten rotating USMs have approximately the same number of Fridays and Saturdays off during a given calendar year. Each USM is entitled to two Fridays and two Saturdays off as RDOs during each thirty-five-day cycle. (DSMF ¶¶26, 103; PRS ¶¶26, 103).[2]

Work schedules are posted thirty days in advance. Any change that occurs less than thirty days in advance requires payment of a "shift-change premium," which amounts to a standard half-day's pay in addition to normal salary. (DSMF ¶36; PRS ¶36). A USM is entitled to time-and-a-half if he or she

---

[2] The schedule pattern for USMs on the rotating schedule is called a "line." A line consists of all the particular rotating tours that a USM works for the year. At the beginning of the year, when the schedule is created, each USM on the rotational schedule is given the choice to pick a line that corresponds to a particular pattern of shifts. Those choices are granted based on seniority. (DE 63-12, at 69:12-22, 71:2-6). If a line becomes available as the result of a vacancy, that line is offered to the USMs in accordance with seniority. (DRS ¶80). Port Authority's expert, Dr. Daniel Levy, provided a helpful visualization (DE 63-15):

Table 1:

| | Thr | Fri | Sat | Sun | Mon | Tue | Wed | Thr | Fri | Sat | Sun | Mon | Tue | Wed | Thr | Fri | Sat | Sun | Mon | Tue | Wed | Thr | Fri | Sat | Sun | Mon | Tue | Wed | Thr | Fri | Sat | Sun | Mon | Tue | Wed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Day / Line | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
| 1 | R | B | . | . | . | A | A | A | A | A | A | A | . | . | C | C | C | C | C | C | C | . | . | B | B | B | B | B | B | . | . | . | R | R | R |
| 2 | R | B | . | . | . | A | A | A | A | A | A | A | . | . | C | C | C | C | C | C | C | . | . | B | B | B | B | B | B | . | . | . | R | R | R |
| 3 | B | . | . | . | R | R | R | R | B | . | . | . | A | A | A | A | A | A | A | . | . | C | C | C | C | C | C | C | . | . | B | B | B | B | B |
| 4 | B | . | . | . | R | R | R | R | B | . | . | . | A | A | A | A | A | A | A | . | . | C | C | C | C | C | C | C | . | . | B | B | B | B | B |
| 5 | . | . | B | B | B | B | B | B | . | . | . | R | R | R | R | B | . | . | . | A | A | A | A | A | A | A | . | . | C | C | C | C | C | C | C |
| 6 | . | . | B | B | B | B | B | B | . | . | . | R | R | R | R | B | . | . | . | A | A | A | A | A | A | A | . | . | C | C | C | C | C | C | C |
| 7 | C | C | C | C | C | C | C | . | . | B | B | B | B | B | B | . | . | . | R | R | R | R | B | . | . | . | A | A | A | A | A | A | A | . | . |
| 8 | C | C | C | C | C | C | C | . | . | B | B | B | B | B | B | . | . | . | R | R | R | R | B | . | . | . | A | A | A | A | A | A | A | . | . |
| 9 | A | A | A | A | A | . | . | . | C | C | C | C | C | C | C | . | . | B | B | B | B | B | B | . | . | . | R | R | R | R | B | . | . | A | A |
| 10 | A | A | A | A | A | . | . | . | C | C | C | C | C | C | C | . | . | B | B | B | B | B | B | . | . | . | R | R | R | R | B | . | . | A | A |

5

is required to work additional time over the normal schedule (or over forty hours per week). (*Id.*).

If a USM assigned to an A, B, or C shift calls out or is absent from work Monday through Thursday, then a Relief Shift USM is reassigned to cover that absence. (DSMF ¶¶22-23; PRS ¶¶22-23). For such a routine substitution, the employer does not have to pay a shift-change premium. (DSMF ¶41; PRS ¶41).

In the event that an R Shift employee is not scheduled, and thus cannot cover an employee absence, or there is a shift vacancy (as opposed to a one-time absence), an overtime equalization roster is used to determine which USM will cover the shift. (DSMF ¶29; PRS ¶29). The shift vacancy is assigned to the USM with the least amount of overtime who volunteers and is available. (*Id.*). In the event that no one volunteers, then the USM who has the least amount of overtime hours is required to work. (*Id.*).

Miller does not deny that this rotating schedule is in place. (PRS ¶17). He disputes, however, that the MOA confines the use of an R Shift substitute to the period Monday—Thursday. Rather, he contends that an R Shift USM could be scheduled Friday through Sunday as well. (PRS ¶¶21-22). He is correct that the MOA does not explicitly confine R Shift substitutions to the Monday–Thursday period. (*See generally* DE 63-13). The MOA requires, however, that past practices be maintained, and Port Authority states that these work schedules are considered to be bargained-for "past practices." (DSMF ¶¶32-34). Because R Shift substitutions have long been scheduled for Monday through Thursday only, that regime is preserved and protected by the MOA. Miller does not offer any evidence in opposition to the employer's past-practices evidence. Miller points out that workers call out[3] sick, which results in schedule modifications, and that Port Authority does not use computer software to make a schedule in the first instance. (PRS ¶34, PSMF ¶¶69-72). These contentions

---

[3]    To "call out" sick, as used here, is synonymous with "calling in" sick. I am informed that to "call out" sick is a regionalism, common in the New York–New Jersey area.

are not on point; they do not create a dispute as to the fact that the structure of the schedule, and its lines, are past practices that are protected by the collective bargaining agreement with the union.

Port Authority offers evidence that any change to the current structure of the schedule would have to be bargained for and incorporated in a new MOA. (DSMF ¶46). In conclusory terms, Miller denies that "reasonably accommodating Mr. Miller would have violated any Port Authority scheduling rules and practices." (PRS ¶46). He points out that there were times when Port Authority had vacant positions that required coverage and, as a result, incurred a premium payment. (PSMF ¶82-84). Again, this does not quite meet Port Authority's point.

The MOA provides for various forms of absences or variations to this rotational schedule. (DE 63-13). To submit a time off request, a USM must choose whether the time will be deducted from allotted personal, sick, compensatory, or vacation days. (DSMF ¶47; PRS ¶47). The MOA allows each USM to initiate two "mutual swaps" per month with another USM. (DSMF ¶28; PRS ¶28; DE 63-3, at 9). Every USM is entitled to three personal excused days (twenty-four hours) for each calendar year. (DE 63-13, at 12).

The MOA also governs use of compensatory time. A USM may accrue up to 160 hours annually of "compensatory time" for hours worked in excess of a forty-hour work week. (DSMF ¶29(a); DE 63-13, at 10). Each calendar year, an employee may convert sixteen hours of compensatory time to personal excused time. (*Id.*). At the time of his termination, Miller had six hours of compensatory time remaining. (PRS ¶29).

The MOA covers use of vacation time as well. A newly-hired USM, if hired in January like Miller, is entitled to ten vacation days. (DE 63-13, at 48; DSMF ¶30). Vacation preferences are honored based upon seniority. (DSMF ¶40). During Miller's deposition, he testified that he had a "basic understanding" of his vacation benefits, but did not "remember" what that meant or how many vacation days he had received upon his hire. (DE 63-9, at 39:14-19, 50:22-24, 81:23-25). He also did not know whether or not he was entitled to a full

vacation allotment at the time of his hiring. (*Id.* at 40:3, 81:23-25). In opposition to Port Authority's motion for summary judgment, however, Miller certified that he believed he had zero accrued vacation days at the time of his separation. (Miller Cert. ¶¶8-9.). The stated basis for that belief—that he received no payout for unused vacation upon his separation—is invalid. Under the MOA, only an employee with at least nine months of service, not terminated for cause, is entitled to a vacation allowance upon separation. (DE 63-13, at 47). Miller's separation notice states that he has less than nine months of service, and that therefore he is not entitled to a vacation allowance or payout. (DE 68-17). Again, Miller's evidence is not responsive; it establishes that he was not permitted to *cash out* his vacation time upon separation; it does not establish that he had not then *accrued* any vacation time that he could have used if his employment had continued.

Regarding Miller's accrued vacation time, Port Authority offers conclusive evidence. Miller's payroll records, including his timesheets, show that he was initially credited with eighty (80) hours of vacation time; twenty-four (24) hours of personal excused time; and eight (8) hours of sick leave on January 4, 2015. (DE 76-4). Every paycheck Miller received thereafter showed his current balance of accrued time, including the eighty hours of vacation time. (*Id.*). These are undisputed matters of routine administration. Miller's subjective beliefs regarding the meaning of the separation notice and his unsupported assumptions regarding the use of vacation time do not establish an issue of material fact.

## B. Miller's Background and Employment with Port Authority

Miller is an adherent of the Jewish faith. (PSMF ¶3). Miller was hired as a USM on January 2, 2015. (DSMF ¶5; PRS ¶5). The USM job posting provides that "USMs work a 40-hour week, which includes working rotating shifts, nights, weekends, holidays, overtime on short notice, and working during inclement weather." (DSMF ¶49). Miller denies that he saw this exact posting, but believes he saw a similar one. (DE 63-9, at 57:7-18). In his job application, Miller stated that he desired to work any shift. (DSMF ¶51; PRS ¶51).

Before being placed on the rotational schedule, USMs go through an indoctrination period, during which they learn the buildings, systems, and locations of EWR. (DSMF ¶53; PRS ¶53). An indoctrination period may last between two weeks and two months, depending on the particular employee's familiarity with the equipment and knowledge base. (*Id.*). Miller's indoctrination period lasted from January 2, 2015 to February 23, 2015. (DSMF ¶55; PRS ¶55). During the indoctrination period, an employee is not assigned to the rotational schedule. (DSMF ¶54; PRS ¶54). It is only upon completion of the indoctrination period that a USM is placed in a line on the rotational schedule. (DSMF ¶56; PRS ¶56).

On January 5, 2015, Miller requested a religious accommodation. Specifically, he requested that he not be scheduled to work on the Jewish Sabbath (which begins at sunset on Friday, and ends at sunset on Saturday), or on Jewish holidays. (DSMF ¶57; PRS ¶57).

For Fridays, Miller requested that he be permitted to leave work at least four hours before sunset. (PRS ¶58). For Saturdays, Miller stated that he could begin working two hours after sunset. (DSMF ¶59; PRS ¶59). Thus Miller's preferred accommodation amounted to a request that he not work any B or C shifts on Fridays, and not work any shifts at all on Saturdays. (DSMF ¶98; PRS ¶98). Miller testified that, in addition, he observed the following eight religious holidays: Purim; Passover; Shavuot; Rosh Hashanah; Yom Kippur; Sukkot, Shemini Atzeret, and Simchat Torah. (DSMF ¶60; PRS ¶60). These holidays would not, however, necessarily require eight additional exemptions; some did not require that he abstain from work, and others coincided with the Sabbath. (PSMF ¶92).

Miller made his accommodation request to Lynch, his direct supervisor. (PSMF ¶16). That accommodation request went up the supervisory chain to McKeon. (DSMF ¶61). Miller says that on January 5, 2015, the same day he made the request, he was brought into a meeting with McKeon, Lynch, Kosakowski, and Michael Hogan (the union representative). (PSMF ¶18).

McKeon told Miller that Port Authority would not be able to accommodate Miller, at least not in the manner requested. (PSMF ¶19).

Later that week, Miller claims, Lynch indicated to him that this was to be his last day of work. (PSMF ¶20). This particular statement is not cited to the record. (*See id.*). The closest support the Court could locate was Miller's deposition testimony, which was as follows:

Q: When was the next time that you had a conversation with anyone at Newark Airport about your religious observances?

A: I believe it was Friday.

Q. Who did you speak with?

A. Billy Lynch.

Q. What did you say to him?

A. Among other conversations.

Q. What did you say to him?

A. Billy Lynch said -- I was under the impression that Friday was going to be my last day.

Q. Okay.

A. And Billy Lynch came over to me and asked me, "Okay, Gary, is that it?" And I just said I just need a letter stating that you couldn't accommodate me." And he said, "Let me see." And he went to -- then we had another meeting with Sarah McKeon. She had questioned why I need the letter since I'm still employed with Port Authority. At which I said, "Okay, if I'm employed then I don't need the letter."

Q. Did you ask her if she would be able to accommodate you?

A. I don't remember.

Q. Why did you think that Friday, meaning four days after you started, would be your last day?

A. For some reason I thought that's what they told me at the meeting. I can't tell you exactly why I thought that, but that's what kind of entered my head.

(DE 63-9, at 49:2-21). These equivocal statements of what Miller "thought" do not establish that Port Authority communicated to Miller that he was going to be fired in the first week of January, and in fact he was not.[4]

The parties dispute the degree of investigation that McKeon undertook to determine whether Miller's preferred accommodation could be granted. Miller faults McKeon for failing to review the rotational schedule with Kosakowski or Lynch, who created the schedule. (PSMF ¶28-30). Miller also notes that McKeon did not figure out the exact cost or impact on particular staff of granting Miller his preferred accommodation. (*Id.* ¶¶31-32). There appears to be no dispute, however, that McKeon reviewed the USM schedules for January and February of 2015; ascertained past practices; considered the constraints of the MOA; and assessed the potential impact on employee morale if Miller's co-employees were required to work additional weekends. (PSMF ¶26; DSMF ¶¶65, 66).

In this motion for summary judgment, Miller claims that his request for an accommodation was rejected by Port Authority the same day he made it (January 5, 2015). That decision, he says, was the final one, and no further accommodation was ever offered to him thereafter. The Port Authority's rejection of Miller's *preferred* accommodation on January 5, 2015 does not imply that Miller was never offered any accommodation after January 5, 2015, or that there were no subsequent meetings to discuss the accommodation.

---

[4]    At any rate, the court is not required to credit unsupported statements. Federal Rule of Civil Procedure 56 "does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment" or for the existence of a genuine issue of material fact. *McCann v. Kennedy Univ. Hosp., Inc.*, 596 F. App'x 140, 146 (3d Cir. 2014) (citing *American Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013)); *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 210 (D.N.J. 2001) ("it is not the Court's obligation to sift through the record searching for a genuine issue of material fact. Rather, it is the parties' obligation to show the absence or existence of such an issue."); *Grant v. Revera Inc.*, Civil Action No. 12-5857 (JBS/KMW), 2014 U.S. Dist. LEXIS 176474, at *7 (D.N.J. Dec. 23, 2014) ("Where . . . party fails to respond to the movant's statement of undisputed material facts . . . with a precise citation to the factual record where contrary evidence exists, then the Court assumes that the opponent has no evidence raising a genuine dispute with the movant's stated fact.").

(PRS ¶75). On that issue, all Miller really offers is a failure of recollection. During his deposition, Miller testified that he did not remember whether anyone from Port Authority spoke to him about his options to use various forms of leave so that he could take time off for religious purposes:[5]

> Q. Do you remember having discussions with anyone at the facility or HR or any other Port Authority employee about what your options could be so that you could take time off for your religious observances?
>
> A. I don't remember.

---

[5]  Miller repeatedly testified that he could not remember what leave allowances were permitted by Port Authority. His testimony included the following:

Q. During your human resources orientation were you told how many vacation days, personal days, things like that you would be allotted as a utility systems maintainer?

A. I don't recall.

Q. Did you ever come to learn how many vacation days, personal days, excused days that you were allotted as a utility systems maintainer?

A. Are you saying before I was hired?

Q. Either before or after, did you ever have an understanding as to what your vacation benefits were?

A. Basic understanding.

Q. What was that basic understanding?

A. I don't remember right now.

. . .

Q. Do you recall attending a meeting with Al Kosakowski and him explaining to you about the vacation allotment guidelines?

A. I don't remember.

. . .

Q. Do you remember having a meeting on March 11, 2015, with Al Kosakowski, Billy Lynch, and Mike Hogan?

A. I don't remember specifically.

Q. Do you remember having a meeting with those individuals at any point in time when you were asked to read the time-off guidelines and you were asked whether or not you understood them?

A. I don't recall.

(DE 63-9, at 39:5-19; 82:10-13, 83:18-2).

(DE 63-9, at 85:15-20)

In contrast, Port Authority has proffered actual evidence of further attempts to accommodate Miller. True, it did not grant Miller his requested blanket exemption for every Sabbath and holiday. It did, however, offer Miller the option of using mutual swaps, and told him that he could use vacation, personal excused, or compensatory time. (DSMF ¶67-68).

On January 8, 2015, there was a meeting among Miller, McKeon, Hogan, and Kosakowski to discuss Port Authority's proposed accommodation. (DSMF ¶68).[6] Port Authority has proffered affidavits and deposition testimony that Miller was advised that he could use paid accrued time (personal, vacation and compensatory time), as well as mutual swaps in excess of the two permitted by the MOA, for religious purposes. (DSMF ¶67-69). That accommodation permitted Miller to use his accrued vacation one day at a time, even through the MOA limits the use of single vacation days to five per year. (DE 63-22). Miller was also permitted to use compensatory time on Fridays and Saturdays; that, too, was a variance from the MOA, which limited compensatory time to R-Shift days only. (*Id.*)

On January 22, 2015, there was a meeting among Miller, Lynch, Hogan, Kosakowski, and Mark Okula, the Maintenance Unit Supervisor, to discuss the procedures for requesting time off. Miller was told that if he had any questions regarding the procedure for taking time off, he should speak to Kosakowski or Hogan. (DSMF ¶75). Miller denies this. He states that "the only other meeting Mr. Miller had with Ms. McKeon (apart from when he was terminated) took place later in the week of January 5, 2015, during which Mr. Miller requested confirmation in writing that he would not be accommodated, and was told that he was not yet terminated and therefore would not be provided anything in writing." (PRS ¶75). This is not exactly responsive to the fact alleged, *i.e.*, a

---

[6]     It is unclear whether Miller is conflating this January 8th meeting with one on January 5, 2015. McKeon's affidavit stated that she learned of the accommodation on January 5th, and that the accommodation was communicated to Miller on January 8th. The issue is not critical.

meeting that did *not* involve McKeon. In addition, this statement of "undisputed fact" conflicts with Miller's own testimony that he did not remember, cited above.

On February 17, 2015, Miller sent Kosakowski an email in which he again requested that he not be "schedule[d] to work on Sabbath and Jewish holidays." (PSMF ¶49; DSMF ¶82). As a result, on February 19, 2015, there was another meeting with McKeon, Kosakowski, and Hogan, in which McKeon reiterated the proffered accommodation. (DSMF ¶83).

### C. Miller's Use of Excused Time for Religious Purposes

Although he denies receiving any such accommodation, Miller did in fact use personal excused time and compensatory time for religious purposes from January through February of 2015. Those excused absences were all approved by Port Authority. I enumerate them here:

On January 9, and January 16, 2015, Miller requested four hours of personal excused time to leave work early on a Friday to observe the Sabbath. Those requests were approved. (DSMF ¶¶73, 74; PRS ¶¶73, 74).

On Friday, January 23, 2015, and Friday, January 30, 2018, Miller requested eight hours of personal excused time to observe the Sabbath. Those requests were approved. (DSMF ¶¶77-78; PRS ¶77-78; PSMF ¶47). At that point, Miller had exhausted his twenty-four hours of personal excused time. (DSMF ¶79, PRS ¶79)

On Friday, February 6, 2015; Friday, February 13, 2015; and Friday, February 20, 2015, Miller submitted requests to utilize four hours of excused compensatory time to observe the Sabbath. Those requests were approved. (DSMF ¶¶80-81, 84; PRS ¶¶80-81, 84; PSMF ¶47).

### D. Unexcused Absences and Termination

On February 23, 2015, Miller completed his indoctrination period, and was placed on the rotating schedule. (DSMF ¶85; PRS ¶85). He was assigned to work seven consecutive A shifts. (*Id.*).

Miller requested eight hours of excused time to observe the Sabbath on Saturday, February 28, 2015. (DSMF ¶86; PRS ¶86). That request was denied

because Miller then had only six hours of accrued compensatory time. (*Id.*). Miller did not come to work on February 28, 2015 and was marked absent without leave ("AWOL"). (DSMF ¶87; PRS ¶87). As a result, another USM on his RDO was called in to work Miller's shift, and Port Authority was required to pay the replacement overtime. (DSMF ¶87; PRS ¶87).

Miller submitted requests for time off "without pay" for four dates: Thursday, March 5, 2015; Friday, March 6, 2015; Saturday, March 7, 2015; and Saturday, March 14, 2015. Those requests were denied. (DSMF ¶¶88, 92; PRS ¶¶88, 92; PSMF ¶88). After he received those rejections, Miller emailed Lynch and Kosakowski, acknowledging the rejections but stating that he nevertheless would not be coming to work. (DE 76-6). He did not indicate that he had tried to arrange a swap with another employee. (*Id.*).

Time off without pay is not a recognized form of time off in the MOA. (DE 63-3; DE 63-11, at ¶7; DE 63-6, at ¶23; DSMF ¶45). Miller denies this, but offers no citation to the record. (PRS ¶45).[7]

As noted above, Miller did not report to work on March 5, 6, 7, or 14, 2015, and was marked AWOL. (DSMF ¶¶89, 93; PRS ¶¶89, 93). An R Shift USM covered Miller's Thursday, March 5th shift (which, because it was in the Monday–Thursday period, did not cause Port Authority to incur either a premium shift-change or overtime cost). (DSMF ¶90; PRS ¶90). On March 6 and 7, 2015, two other USMs on their RDOs were called into work. Because

---

[7]    Miller does contend, however, that Port Authority's citation to the record fails to establish the existence of such a policy. (*Id.*). To be sure, the cited reference, the Affidavit of Kosakowski, states that Miller was entitled to ten vacation days for the 2015 year, and three personal excused days. (DE 63-6, at ¶6). It does not state that Miller was entitled to, or not entitled to, unpaid time off. (*Id.*). However, the clear inference from the Affidavit is that this was a complete list of the types of leave permitted (vacation and personal days). The Port Authority's motion is replete with references to this fact. (DE 63-3; DE 63-11, at ¶7; DE 63-6, at ¶23; DSMF ¶45). The pre-printed Time Off Request forms submitted by Miller as part of this motion, and utilized by Port Authority, similarly do not provide for time off without pay. (DE 68-16). In short, there is nothing in the record that suggests time off without pay is either permitted by the MOA or in practice by Port Authority. Miller's bare, unsupported denial does not create an issue of fact, nor is it particularly material.

these dates were a Friday and a Saturday, Port Authority was obliged to pay the substitutes overtime. (DSMF ¶92; PRS ¶92).

Miller was terminated on or about March 21, 2015. (DSMF ¶97). In total, Miller used personal excused time on seven occasions between January and February of 2015. It is undisputed that Miller did not use vacation time or mutual swaps prior to being terminated.

As for vacation time, Miller asserts that he had none accrued. He bases that assertion on his separation notice, which, as stated above, is irrelevant. (*See* p.8, *supra*.) He "assume[s]" that if he had possessed any vacation time, Port Authority would have granted his last requests in March. (Miller Cert. ¶8). Miller essentially admits, however, that the burden was on him to claim vacation time; to submit a time off request, a USM must choose whether the time will be deducted from allotted personal, sick, compensatory, or vacation days. (DSMF ¶47; PRS ¶47).

As for mutual swaps, Miller offers contradictory and vague accounts. He testified in his deposition that he did not recall whether he ever attempted to get another USM to swap shifts with him. (DRS ¶52). In opposition to Port Authority's motion for summary judgment, however, he submitted a certification in which he now recollected that he did attempt to get other employees to swap with him. His certification proffers no specific examples, however, and names no employees whom he approached. One of the few details he does proffer is that that he offered to swap for a Sunday shift. (Miller Cert. ¶¶12-13). Port Authority offers evidence, however, that between February 23, 2015, and his termination in March, Miller did not have any Sundays to swap. (DRS ¶62). It also offers testimony of the union representative, Hogan, who testified to a conversation that happened in January of 2015, wherein Hogan and another USM, Tim Bonner, told Miller that they were willing to swap shifts with him. (DE 63-16, at 38:1-42:25, 43:12-15). Miller never asked Hogan to swap, however. (*Id.* at 48:17-24).

In his certification Miller adds that he "felt very strongly there was a distinct atmosphere from my co-worker that voluntary swapping . . . would be

16

looked upon negatively by the supervisors, and this caused great reluctance from my co-workers to assist me in any way." (Miller Cert. ¶13). Miller does not identify any such co-worker, or assert any other facts to justify what he "felt." This is insufficient to create or heighten any issue of fact.

Miller claims that Port Authority did not do enough to assist with mutual swaps. His managers, he says, did not identify anyone who would be willing to swap with him, and there was no system in place to facilitate voluntary swaps. (*Id.* at ¶14). Kosakowski, however, made an announcement to other USMs that Miller would be looking for swaps and that they should consider his requests. (DSMF ¶71). Kosakowski also told directed Miller to the Watch Engineers Office at EWR, which had a list of all Unit 329 staff and their personal phone numbers so that he could arrange swaps. (*Id.* at ¶72).

### E. Burden of Miller's Preferred Accommodation

Miller requested, in essence, a blanket exemption from all Fridays, A and B shifts on Saturdays, and Jewish holidays.

In total, Miller would have needed a Sabbath accommodation for forty-five days in 2015. (DSMF ¶105; PRS ¶105). Miller's assigned work schedule would have conflicted with the Sabbath on five occasions during each thirty-five-day rotation schedule during Eastern Standard Time ("EST"). During Daylight Savings Time ("DST"), that total would have been reduced to four. (DSMF ¶104; PRS ¶104).

Miller generally requested an accommodation for Jewish holidays, but did not specify exactly which ones. The parties now dispute the extent to which this particular request would require an accommodation. Miller now proffers that he is not required to refrain from working on some of these holidays, but does not specify which ones. (PRS ¶60; PSMF ¶92; Miller Cert. ¶5). The Port Authority, estimating, has suggested that Miller would have needed an accommodation on fourteen additional work days to observe holidays. (DSMF ¶115).

The Port Authority has put forth several reasons why granting Miller's preferred accommodation would impose more than a *de minimis* burden:[8] (1) other USMs would have to take on additional Friday evening and Saturday shifts to cover Miller's absence; (2) exempting Miller from Friday evening and Saturday shifts would effectively create a new shift that would need to be offered to the most senior USM in compliance with the MOA; (3) employees with heavier weekend work schedules are harder to retain; and (4) Miller could not have been accommodated without Port Authority's incurring a shift-change premium or overtime costs. (DSMF ¶¶99, 101, 116-117). The total economic cost of accommodating Miller's time off requests to observe the Sabbath and religious holidays was $7,303 in 2015. (*Id.* ¶117). The cost of overtime to cover Miller's observance of the Sabbath for 2015 would have been $17,296. (*Id.* ¶112)

Miller offers several arguments to counter the extent of the burden and to suggest that the burden would have been *de minimis*. The dollar figures, he says, are inflated because the expert failed to consider that (1) Miller would not need an accommodation for some Jewish holidays; (2) an involuntary swap made thirty days in advance does not result in a premium payment; and (3) an R shift employee can be scheduled on a Friday or Saturday. (PSMF ¶¶85-96).

It is undisputed that the rotating schedule is prepared annually in advance, and is tweaked if employees call out. (PSMF ¶¶69-72; DRS ¶69). As a result, Port Authority incurs shift-premium costs, and overtime, due to last minute shift changes. (PSMF ¶78; DRS ¶73). In the event that a shift change occurs with more than thirty days' notice, then the shift-change premium cost is not incurred by Port Authority. (*Id.* ¶79). However, Port Authority may nonetheless incur overtime costs for these changes. (DRS ¶79).

---

[8]     That is the relevant test under Title VII. A proposed religious accommodation constitutes an "undue hardship" if it would impose more than a *de minimis* burden on the employer. *See* Section III, *infra* (citing *Trans World Airlines v. Hardison*, 432 U.S. 63 (1977); *Protos v. Volkswagen*, 797 F.2d 129 (3d Cir. 1986)).

Miller also suggests that there are no seniority implications for the ten rotational USMs or in the selection of overtime. (*Id.* ¶¶80-81). Further, Port Authority frequently had vacancies, which caused it to incur a premium payment or overtime cost to cover those shifts whenever a Relief USM was not working or available to fill the shift. (*Id.* ¶¶82, 84). During Miller's employment, Port Authority did not have any vacancies. (*Id.* ¶84; DRS ¶82).

Finally, Miller notes that the entire agency, not just EWR, had a $206 million budget for overtime costs in 2015. (PSMF ¶97; DRS ¶97; DE 68-24). This figure includes overtime related to police ($103 million), firefighting ($13.6 million), and snow removal ($15 million). (DE 68-24).

## II.     Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III. Discussion

Title VII protects employees from adverse employment actions on the basis of religion:

> (a) It shall be an unlawful employment practice for an employer --
>
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion[.]

42 U.S.C. § 2000e-2(a); *see Hardison*, 432 U.S. 63; *Protos*, 797 F.2d 129. Under Title VII, employees may assert two different theories of religious discrimination: disparate treatment and failure to accommodate. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 281 (3d Cir. 2001). Miller originally pled both theories, but he does not contest the dismissal of Count II of the complaint, which alleges disparate treatment. (PBr at 40 n.2). Accordingly, this opinion will address only Miller's accommodation claim.

Religion is defined to include all aspects of religious observance and practice unless the employer demonstrates that he or she cannot "reasonably accommodate" the employee's religious needs without "undue hardship." 42 U.S.C. § 2000(e)(j). In order to establish a *prima facie* claim of religious discrimination based on a failure to accommodate, "the employee must show: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement." *Webb v. City of Phila.*, 562 F.3d 256, 259 (3d Cir. 2009) (citing *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000)). Once the plaintiff establishes a *prima facie* claim, "the burden shifts to the employer to show either it made a good-faith effort to reasonably accommodate the religious belief, or such an accommodation would work an undue hardship upon the employer and its business." *Id.*

Here, Port Authority does not challenge the *prima facie* elements. It is not disputed that Miller held a sincere religious belief that conflicts with a job requirement of working on the Jewish Sabbath and holidays. Further, he told

Port Authority of this conflict. Finally, he was terminated for absences when he declined to report to work on the Sabbath.

Once a plaintiff has set forth a *prima facie* claim of religious discrimination, the burden shifts to the employer. The Port Authority asserts that (1) it offered Miller a reasonable accommodation; (2) Miller did not make a good faith effort to accommodate his Sabbath observance beliefs through the means offered by Port Authority; and (3) Miller's preferred accommodation would have imposed an undue hardship on Port Authority as employer.

### A. Reasonable Accommodation of Sabbath Observance

#### 1. Legal principles governing good faith accommodation and duty to cooperate

Title VII does not explicitly define a "reasonable accommodation" in terms of religion. *Shelton*, 223 F.3d at 225. What is clear, however, is that the standard imposed on employers for a religious accommodation is not as demanding as the accommodation of a disability required under the Americans with Disabilities Act of 1990 ("ADA"). The object is to "eliminate[] the conflict between employment requirements and religious practices." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986). Courts have recognized, however, that Congress intentionally used the word "reasonable," and rejected arguments that employers are required to totally eliminate any conflict. *See, e.g., id.* at 70 (noting that Congress "did not impose a duty on the employer to accommodate at all costs.").[9]

Title VII "does not require employers to accommodate the religious practices of an employee in exactly the way the employee would like to be accommodated. Nor does Title VII require employers to accommodate an

---

[9]   *Accord EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 313 (4th Cir. 2008) (recognizing Congress's use of the word "reasonable" and rejecting argument that employer reasonably accommodates only when it totally eliminates the conflict); *EEOC v. Thompson Contracting, Grading, Paving, & Utils., Inc.*, 793 F. Supp. 2d 738, 744 (E.D.N.C. 2011) ("accommodation does not have to 'totally' eliminate the conflict between the work requirement and religious practice; the accommodation must only be reasonable") (citation omitted)).

employee's religious practices in a way that spares the employee any cost whatsoever." *Getz v. Pa., Dep't of Pub. Welfare*, 802 F.2d 72, 74 (3d Cir. 1986) (internal quotation and citation omitted); *Prise v. Alderwoods Grp., Inc.*, 657 F. Supp. 2d 564, 601 (W.D. Pa. 2009) ("An employer is not statutorily required to offer an employee his or her preferred accommodation in circumstances where a sufficient accommodation has already been provided."). "Where both the employee and employer propose an accommodation, the employer does not have to accept the employee's proposal." *Philbrook*, 479 U.S. at 68 ("any reasonable accommodation by the employer is sufficient to meet its accommodation obligation.").

The requirement of reasonableness goes both ways, imposing a duty of "bilateral cooperation" in the search for a reasonable accommodation. *Philbrook*, 479 U.S. at 69. The employer is required to make a good faith effort to accommodate an employee's religious beliefs; the employee has a duty to cooperate with the employer's good faith efforts to accommodate. *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 506 & n.30 (5th Cir. 2001); *see also Beadle v. Hillsborough Cnty. Sheriff's Dep't*, 29 F.3d 589, 593 (11th Cir. 1994) (stating that employee has "duty to make a good faith attempt to accommodate his religious needs through means offered by the employer").

The employee therefore cannot make an all-or-nothing demand, but must work with an employer that is attempting to offer an accommodation:

> An employee cannot shirk his duties to try to accommodate himself or to cooperate with his employer in reaching an accommodation by a mere recalcitrant citation of religious precepts. Nor can he thereby shift all responsibility for accommodation to his employer. Where an employee refuses to attempt to accommodate his own beliefs or to cooperate with his employer's attempt to reach a reasonable accommodation, he may render an accommodation impossible.

*Chrysler Corp. v. Mann*, 561 F.2d 1282, 1285 (8th Cir. 1977); *see also Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145-46 (5th Cir. 1982) (no Title VII violation where employee did not fully explore employer's proposed religious accommodation).

If the employer offers an accommodation that is reasonable, "the statutory inquiry is at an end." *Philbrook*, 479 U.S. at 68. The employer is not then required to show that it could have adopted each of the employee's suggested accommodations without incurring an undue burden. *Id.* (noting that undue hardship on employer's business is at issue only when employer fails to offer any accommodation). *See also Getz*, 802 F.2d at 73 (employer must show that it made "good faith efforts to accommodate, and if such efforts were unsuccessful, to demonstrate that it was unable to reasonably accommodate without undue hardship.").

The employer is required to identify and adopt *an* accommodation that is reasonable, not to offer the employee a menu of options. Any such requirement, the Supreme Court has said, would give an employee "every incentive to hold out for the most beneficial accommodation despite the fact that an employer offers a reasonable resolution of the conflict." *Philbrook*, 479 U.S. at 69. In short, "[s]o long as the accommodation [offered by the employer] reasonably balances the employee's observance of her religion with the employer's legitimate interest, it must be deemed acceptable." *Cloutier v. Costco Wholesale*, 311 F. Supp. 2d 190, 200 (D. Mass. Mar. 30, 2004) (citing *Philbrook*, 479 U.S. at 70).

An acceptable accommodation may consist of a combination of measures which, taken together, meet the statutory standard of reasonableness. Several Circuits have held that, when analyzing whether an employer provided a reasonable accommodation, a "court should take a 'totality of the circumstances' approach and consider whether the *combination* of accommodations provided by the employer was reasonable." *Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 12 (1st Cir. 2012) (emphasis in original).[10]

---

[10]    *Accord Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1030 (8th Cir. 2008) ("What is reasonable depends on the totality of the circumstances and therefore might, or might not, require elimination of a particular, fact-specific conflict."); *Hudson v. W. Airlines, Inc.*, 851 F.2d 261, 266 (9th Cir. 1988) (examining accommodations and

Although this "combination" approach has not been expressly endorsed by the Third Circuit, I find it reasonable and I adopt it. It offers both employers and employees much-needed flexibility. Thus if one option, such as a mutual swap, is not available on a particular occasion, the employee can exercise another. Each case turns on its own facts and circumstances, however, and the determination of "reasonableness" will depend on the unique circumstances of the employer-employee relationship.

The requirements of a seniority system or union contract may affect the determination of what is reasonable. *Hardison*, 432 U.S. 63, is the seminal Supreme Court case addressing a "reasonable accommodation" and "undue burden" in the context of an agreed-upon seniority system. Self-evidently, it has many features in common with this case, and so I summarize it at some length.

In *Hardison*, the Court addressed "the extent of the employer's obligation under Title VII to accommodate an employee whose religious beliefs prohibit him from working on Saturdays." *Id.* at 66. The plaintiff was an aircraft maintenance stores clerk, a position that had to be staffed twenty-four hours a day, every day of the year. *Id.* In the event that an employee's position in that department was vacant, another employee would be shifted from another department or a supervisor would cover the job. *Id.* at 66-67. The employer had also adopted a seniority system, which provided that the most senior employees had "first choice for job and shift assignments." *Id.* at 67.

The plaintiff, a member of the Worldwide Church of God, informed his employer that he could not work from sunset on Friday until sunset on Saturday. *Id.* at 67. The employer agreed that the union representative should seek a job swap or a change of days off, and for its own part the employer agreed to seek another, non-conflicting job assignment for the plaintiff. *Id.* at 67-68. A shift change temporarily resolved the conflict. The plaintiff eventually

---

concluding that "[a]ll of these accommodations together" provided employee with reasonable accommodation).

bid for and took a different position, however, one for which he was second from the bottom in terms of seniority. *Id.* at 68. There, he was asked to work Saturdays when another employee was on vacation, and he did not have sufficient seniority to bid for a shift with Saturdays off. *Id.*

At that point, the employer declined to further accommodate the plaintiff's demand to have every Saturday off. *Id.* The Court recognized that the position could not be left vacant, and that if plaintiff were granted his preferred accommodation, the employer would have to fill his position with a supervisor or another employee, or else force someone to fill this shift, requiring the company to pay a wage premium. *Id.* at 68-69.

The *Hardison* Court recognized that a seniority system, particularly one that is the result of collective bargaining, has weighty claims of its own. It "represents a neutral way of minimizing the number of occasions when an employee must work on a day that he would prefer to have off." *Id.* at 78. Relieving one employee of the Saturday shift would have required that a senior employee fill in for him. Denying that senior employee his or her shift preference would violate the collective bargaining agreement. *Id.* at 80. It would be "anomalous," the Court held, "to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the shift and job preference of some employees . . . in order to accommodate or prefer the religious needs of others . . . . Title VII does not require an employer to go that far." *Id.* at 81.

Since *Hardison*, courts have further fleshed out what constitutes a reasonable Sabbath accommodation in the context of a union agreement or rotational schedule — circumstances that apply here. As one court recognized, "rotating shift schedules that spread weekend work as evenly as possible among employees are nearly universally recognized as a neutral way for employers to distribute work." *Bolden v. Caravan Facilities Mgmt., LLC*, 112 F. Supp. 3d 785, 791 (N.D. Ind. 2015). In that context, "the opportunity for employees to swap shifts has been recognized as a way for employers to cure

any conflict the neutral schedule creates with an employee's request for days off for religious reasons." *Id.*

Courts have recognized in that context that voluntary swapping of shifts can constitute a reasonable accommodation in the context of a neutral rotating shift system. Numerous examples are set forth in the margin.[11] Indeed, even an existing mutual swap program can constitute a reasonable accommodation even if the swap program was not instituted in response to the employee's demand for an accommodation. A preexisting policy that allows mutual swaps among employees may suffice.[12]

---

[11]     *See, e.g., Sánchez-Rodríguez*, 673 F.3d at 12 (affirming grant of summary judgment to employer AT&T where employee, installation technician, worked rotating Saturdays and employer accommodated employee by allowing him to swap shifts with co-workers, even though co-workers would not swap shifts with employee); *Sturgill*, 512 F.3d at 1032 (employer reasonably accommodated employee's request for religious accommodation when it allowed employee to swap shifts with another employee); *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (affirming judgment that employer reasonably accommodated employee where it approved employee's requests for shift swaps even though employer "did not actively assist in coordinating other shift arrangements," but did post master employee schedule that employee could have used "to find someone with whom to swap."); *Genas v. State of New York Dep't of Corr. Servs.*, 75 F.3d 825, 832 (2d Cir. 1996) (concluding that employer offered reasonable accommodation by allowing shift swaps); *Beadle*, 29 F.3d at 593 (affirming judgment that employer reasonably accommodated employee by allowing employee to arrange shift swaps with his co-workers, which employer aided by providing him with employee roster sheet and permitting him to advertise his need for shift swaps during daily roll calls); *Brener*, 671 F.2d at 143, 145-46 (holding that pharmacist, who was required to work weekends as part of rotational schedule and who observed Sabbath (from sunset Friday to sunset Saturday), was reasonably accommodated when he was allowed to trade shifts with other staff pharmacists); *Rojas v. GMD Airlines Servs.*, 254 F. Supp. 3d 281, 296 (D.P.R. 2015) (granting summary judgment where employer reasonably accommodated employer where it permitted employee to swap shifts, even though employee was unsuccessful in finding swap); *EEOC v. Caribe Hilton Int'l*, 597 F. Supp. 1007, 1011 (D.P.R. 1984) (employer reasonably accommodated plaintiff by authorizing shift swaps and transfer to position with less shifts during Sabbath), *aff'd*, 821 F.2d 74 (1st Cir. 1987); *see also* 29 C.F.R. 1605.2(d)(i) (EEOC guideline providing that "[r]easonable accommodation without undue hardship is generally possible where a voluntary substitute with substantially similar qualifications is available.").

[12]     *Hudson v. W. Airlines, Inc.*, 851 F.2d 261, 263 (9th Cir. 1988) (finding that employer reasonably accommodated plaintiff's Sabbatarian observance where the applicable collective bargaining agreement permitted employee to trade shifts, and the employer posted employees' schedules, which facilitated swaps); *Chrysler*, 561 F.2d at

The courts have also held that an employer may require an employee to use vacation days or take unpaid leave, without running afoul of the reasonableness requirement. Again, examples are numerous, and are set forth in the footnote.[13]

The use of mutual swaps or vacation leave, then, may each independently satisfy the reasonable accommodation standard. So too may the *combination* of mutual swaps and leave, as many cases attest.[14]

---

1285 (recognizing that employer is not obligated to change its schedule where "procedures and scheduling already provide a measure of elasticity in switching work shifts and in allowing excused absences."); *see EEOC v. Bridgestone/Firestone, Inc.*, 95 F. Supp. 2d 913, 928 (C.D. Ill. 2000) ("[A] system of voluntary swaps always depends on willing volunteers, yet courts have consistently found these systems to be reasonable accommodations, even when a swap was not always possible." (citation omitted)).

[13]  *See Ansonia*, 479 U.S. at 70 ("requiring respondent to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one."); *Getz*, 802 F.2d at 72 (affirming that employer reasonably accommodated employee by permitting employee to use accrued vacation and personal leave time for Sabbath observance); *Reichman v. Bureau of Affirmative Action*, 536 F. Supp. 1149, 1175 (M.D. Pa. 1982) (finding that employer reasonably accommodated employee by granting employee's request for leave with pay); *see also Chrysler*, 561 F.2d 1282 (8th Cir. 1977) (finding that defendant did not fail to accommodate Sabbath observer who failed to avail himself of collective bargaining provision that allowed for paid and unpaid leaves of absences); *Lee v. ABF Freight Sys.*, 22 F.3d 1019, 1022 (10th Cir. 1994) (affirming grant of summary judgment to employer who permitted employee to use two weeks of vacation time to accommodate Sabbath observance); *Guy v. MTA N.Y.C. Transit*, No. 10 CV 1998, 2012 U.S. Dist. LEXIS 138526, at *26-*27 (E.D.N.Y. Aug. 6, 2012) (granting summary judgment where defendant permitted plaintiff to observe to Sabbath by using his paid vacation days and unpaid personal days), *R&R adopted*, 2012 U.S. Dist. LEXIS 138523 (E.D.N.Y. Sept. 26, 2012).

[14]  *Rodriguez v. Verizon Communs.*, Civil Action No. 16-4202, 2018 U.S. Dist. LEXIS 90420, at *1-2, *13-14 (D.N.J. May 30, 2018) (granting summary judgment where employer allowed employee, who sought accommodation for Sabbath and ten to twelve holy days, to swap shifts or to take paid or unpaid leave); *see also Firestone Fibers & Textiles*, 515 F.3d at 315 (affirming grant of summary judgment where employer permitted employee to use fifteen vacation days, three floating holidays days, swapping shifts, and sixty hours of unpaid leave to observe Sabbath); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1152-53 (10th Cir. 2000) (affirming grant of summary judgment for employer where employer permitted employee to take leave on Saturdays and to initiate voluntary swaps with other employees); *United States v. Albuquerque*, 545 F.2d 110, 112 (10th Cir. 1976) (recognizing that use of vacation leave, taking leave without pay, and trading shifts with another employee was

When I say that, *e.g.*, shift swapping may constitute a reasonable accommodation, I do not mean to imply that it *must* suffice as a matter of law; that will depend on the facts of the case. Permitting employees to swap shifts on a voluntarily basis "does not definitively constitute 'reasonable accommodation' as a matter of law in all cases." *EEOC v. Robert Bosch Corp.*, 169 Fed. App'x 942, 944 (6th Cir. 2006).

Most obviously, if a shift change or swap does not actually resolve the conflict, then it is not a reasonable accommodation. *See Baker v. The Home Depot*, 445 F.3d 541, 547 (2d Cir. 2006) (employer did not reasonably accommodate employee where it offered only to shift the employee from the night shift to the morning shift, but still required him to work on the Sabbath).

More subtly, a shift swap may not be a reasonable accommodation where the swap itself violates an employee's religious scruples against encouraging others to work on the Sabbath. *Smith v. Pyro Min. Co.*, 827 F.2d 1081, 1088 (6th Cir. 1987), *cert. denied*, 485 U.S. 989 (1988). Likewise, a reasonable accommodation may not be found where the work environment maintained by the employer is so hostile to swaps that they are not a realistic alternative. *See McGuire v. Gen. Motors Corp.*, 956 F.2d 607, 610 (6th Cir. 1992) (summary judgment inappropriate where employer allowed employee to swap shifts, but compromised willingness of other employees to do so by taking survey of employees, who then became reluctant to swap shifts). In each of those cases, I

reasonable accommodation for employee who could not work Sabbath from Friday sunset to Saturday sunset, and refusing to require supervisor to find another employee for plaintiff who would trade shifts, *cert. denied*, 433 U.S. 909 (1977); *Thompson Contracting*, 793 F. Supp. 2d at 744 (granting summary judgment where employer permitted Sabbath-observing employee to use shift swapping and paid personal leave, even though employee was a probationary employee and was not yet able to use paid leave), *aff'd*, 499 Fed. App'x 275 (4th Cir. 2012); *Ellington v. Murray Energy*, 2010 U.S. Dist. LEXIS 104363, at *33-34 (D. Utah Sep. 30, 2010) (granting summary judgment where employer offered reasonable accommodation to employee to swap shifts or use personal days or vacation days to accommodate Sabbath observance); *Durant v. NYNEX*, 101 F. Supp. 2d 227, 233 (S.D.N.Y. 2000) (granting summary judgment where employer offered reasonable accommodation of swapping shifts and using vacation days for days that conflicted with Sabbath).

note, there was some aggravating factor above and beyond the mere inability of the employee to find a volunteer to swap shifts on a particular day.

## 2. Application to this case

Here, Mr. Miller was offered several options, alone and in combination, to accommodate his Sabbath observance. The employer did not merely cite its preexisting policies and declare them to be sufficiently flexible. Indeed, to accommodate Miller it was willing to go beyond what was required by the collective bargaining agreement with its employees. *Cf. EEOC v. Aldi, Inc.*, 2008 U.S. Dist. LEXIS 25206, at *29 (W.D. Pa. Mar. 28, 2008) ("pre-existing neutral rotation system along with a voluntary shift swap policy *may* constitute a reasonable accommodation under Title VII under certain circumstances; holding, however, that employer's "mere reliance on its pre-existing policy without any further action" was insufficient to support summary judgment for employer) (emphasis in original)).

At that time, Port Authority's collective bargaining agreement with its employees limited shift swaps to two per month, and usually required that vacation days be used in blocks (*i.e.,* not one day at a time). In response to the request for an accommodation, however, Port Authority authorized Miller to engage in unlimited shift swaps, as well as to use vacation, personal, and compensatory time at will. *See Rodriguez*, 2018 U.S. Dist. LEXIS 90420, at *13-14 (granting summary judgment where employer allowed employee to use single vacation days, contrary to CBA). Miller availed himself of those accommodations on seven occasions before he unilaterally began submitting requests to take leave without pay, an accommodation that had not been offered by the employer.

On the reasonable-accommodation element, Miller has not presented competent evidence that would defeat Port Authority's motion. He challenges the employer's proffered accommodation on two grounds: (1) that the vacation time accommodation was illusory, because he did not have any accrued vacation time; and (2) that the shift swap accommodation was illusory, because

co-workers would not swap shifts with him and Port Authority did not do enough to facilitate the swaps on his behalf.

As to the first ground, based on the alleged lack of accrued vacation time, Port Authority has submitted persuasive contrary documentary evidence. New hires are entitled to ten vacation days (80 hours). Miller's paychecks showed his accrued-time balances, including 80 hours of vacation time. (*See* p.8, *supra*). These are not credibility-dependent, historical facts. They are administrative facts—true by virtue of having been declared so by a person or entity with authority. More plainly, if your employer says you're entitled to a vacation day, then you are.

Miller responds in his certification that he had no accrued vacation time. In support of that contention, however, he offers only a citation to his separation notice. The citation is inapposite. True, Miller was not given a *payout* for unused vacation time upon his separation; that, however, was not because he had no vacation time, but rather because under the MOA, such a payout requires nine months of service (and Miller had only three). So Miller's failure to receive a payout did not signify that he lacked accrued vacation time, and in fact he did have vacation time available. (*See* p. 8, *supra*).

Miller's certification states that he "assumed" his last requests for an accommodation in March would have been granted by Port Authority if he had possessed accrued vacation time. That is sheer speculation. It contradicts the business records of Port Authority. It also contradicts Miller's previous sworn deposition testimony that he understood it was the employee's, not the employer's, obligation to designate the type of time to be used to support a time-off request. In other words, an employee who wants vacation time credited against an absence must request it. Miller's "assumption" is insufficient to create an issue of material fact as to whether Miller had vacation time available to accommodate his Sabbath absences. (*See* pp. 8, 16, *supra*).

Miller's second challenge concerns the efficacy of mutual swaps as an accommodation. During his deposition, Miller testified that he did not recall

whether he sought any swaps prior to his termination. In opposition to Port Authority's motion for summary judgment, however, Miller filed a certification in which he now recalled that he offered to work a Sunday shift, but that no one was willing to swap with him for a Saturday. This contention is virtually fact-free. The certification does not state whether Miller made one or more than one swap request; does not identify any co-worker he asked to swap; does not give the date of any such request; and does not state the substance of any such conversation. This is simply too vague to raise an issue of fact. (*See* p. 17 *supra*).[15]

But even assuming the truth of this vague contention, it is not material for summary judgment purposes. One of the few facts Miller reveals is that a

---

[15]     As noted, Miller previously testified in a deposition that he had no recollection of making a swap request. Then, in response to the summary judgment motion, he submitted a certification in which, however vaguely, he claimed to recall making such a request of an unspecified co-worker at an unspecified time. Miller does not provide a reasonable explanation for this turnaround. For the reasons stated in text, the certification, even taken at face value, is insufficient to create an issue of fact. In the alternative, the "sham affidavit" doctrine would justify setting the certification aside.

"A district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember." *Crawford v. George & Lynch, Inc.*, 19 F. Supp. 3d 546, 557 (D. Del. 2013).

The purpose of the "sham affidavit doctrine" is to prevent a party from defeating summary judgment "by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Jiminez*, 503 F.3d at 251 (citing *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)). A certification is a "sham" if it contradicts the affiant's prior testimony and there is no valid explanation for the inconsistency. *Baer*, 392 F.3d at 624. However, "[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." *Baer*, 392 F.3d at 625. "Such corroborating evidence may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition." *Jiminez*, 503 F.3d at 254. In the event that the swearing party fails to explain the contradiction or offers a "weak explanation for his sudden ability to remember important facts," a district court may "disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition." *Crawford*, 19 F. Supp. 3d at 557 (citing *Yeager*, 693 F.3d at 1081); *Jiminez*, 503 F.3d at 254.

Here, Miller has offered no explanation for his sudden ability to recall critical facts, which are contradicted by competent evidence.

swap he sought in March 2015 was for a Sunday shift. Between February 23, 2015 and his termination in March, however, Miller did not have any Sunday shifts assigned to him. So it is highly unlikely that he offered a Sunday shift, but even if he did, it was not his to give. (DRS ¶62). (*See* pp.16-17, *supra*).

In addition, there is unrebutted evidence that there was at least one willing swap partner. Hogan, the union representative, testified that he and another USM were willing to swap with Miller, and told him so. Indeed, Hogan preferred to work Friday shifts. Hogan testified that Miller never asked him to swap, however, and Miller submits no evidence or testimony that he ever did. (DE 63-16, at 42:11-25, 43:12-15, 48:17-24).

Finally, Miller's subjective feelings are insufficient to create an issue of fact as to the availability of swaps. He certified that he "felt very strongly there was a distinct atmosphere from my co-worker that voluntary swapping . . . would be looked upon negatively by the supervisors, and this caused great reluctance from my co-workers to assist me in any way." (*See* pp.16-17, *supra*). Miller does not identify any such co-worker, or otherwise assert any other facts to support this belief. Cases resting on this factor have involved some positive act of discouragement by the employer, not a subjective feeling. *See McGuire*, 956 F.2d at 610 (employer circulated an intimidating employee "survey").

In contrast, Port Authority has offered competent evidence in the form of sworn testimony that it encouraged and promoted swaps as an accommodation. Kosakowski made an announcement to USMs that Miller would be seeking swaps and that employees should consider his request; Port Authority posted the USMs' schedules and personal phone numbers, which Miller could have used to find swaps; Lynch testified that he would have approved any mutual swap that was submitted to him; and Hogan testified that he offered to swap with Miller, who did not take him up on it. (DRS ¶63). No additional obligations are imposed on an employer.[16] And there is nothing

---

16      *See Albuquerque*, 545 F.2d at 112 (refusing to find accommodation not reasonable because supervisor did not find search for employee with which plaintiff could trade shifts); *Morrissette-Brown*, 506 F.3d at 1319 (employer not required to

in the record to indicate that Miller asked his employer to take a more active role in facilitating swaps, either at the time he initially sought an accommodation or afterward.[17]

Miller attacks the sufficiency of the leave accommodation and the mutual swap accommodation separately, instead of considering them in combination. For that reason, the Sixth Circuit and district court cases cited by Miller are readily distinguishable.[18] For example, an employer who offers only the use of vacation time may be found not to have reasonably accommodated an employee if the employee will inevitably run out of accrued time to use. But that is not the case here, where a combination of accommodations was available. Those cited cases, moreover, are contrary to the Third Circuit case of *Getz*, 802 F.2d at 72, which found that an employer reasonably accommodated an employee by permitting the use of accrued vacation and personal leave time for Sabbath observance. That, the Third Circuit held, was a "reasonable" as opposed to a "total" accommodation.

---

"actively assist in coordinating other shift arrangements," where it posted master employee schedule that employee could have used "to find someone with whom to swap.").

[17] See *Thomas*, 225 F.3d at 1156-57 (noting that record did not indicate that employee requested employer to help with swaps "at the time that the reasonable accommodation was being sought" and "[a]lthough an employer has a duty reasonably to accommodate an employee's religious beliefs ..., this duty does not obligate the employer to consider and preclude an infinite number of possible accommodations.").

[18] See *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1379 (6th Cir. 1994) (finding that "[a]n employer who permits an employee to avoid mandatory Sabbath work only by using accrued vacation does not 'reasonably accommodate' the employee's religious beliefs"); *Krop v. Nicholson*, 506 F. Supp. 2d 1170, 1177 (M.D. Fla. 2007) (denying summary judgment where employer, who had previously allowed Sabbath observing employee to use leave without pay ("LWOP"), subsequently required employee to use accrued leave because employer failed to show that permitting Plaintiff to use LWOP would have caused undue hardship); *Walker v. Alcoa, Inc.*, 2008 U.S. Dist. LEXIS 45684, at *30-31 (N.D. Ind. June 9, 2008) (denying summary judgment where employer offered employee to use fifteen days of vacation as accommodation for Sabbath). *Walker* reasoned that the accommodations offered to the employee were not sufficient because they did not "remove entirely the possibility that [plaintiff] would have to work on Sunday." *Walker*, 2008 U.S. Dist. LEXIS 45684, at *33. As noted above, such a standard removes the word "reasonable" from the statutory language and requires a total accommodation.

Closer to the mark, but still unpersuasive, is Miller's citation of an Alabama district court case, *Berry v. MeadWestvaco Packaging Sys., LLC*, 2011 U.S. Dist. LEXIS 25777 (M.D. Ala. Mar. 14, 2011). There, the employer offered two accommodations: it allowed plaintiff (1) "to swap shifts with other operators; and (2) . . . to use his vacation time." *Id.* at *14. The plaintiff in that case failed to find a swap partner, and he did not have enough vacation time to cover his religious observances. *Id.* In response, the employer told him to "find another job." *Id. Berry* itself recognized that "even if a plaintiff cannot always find another employee to swap with," a mutual swap can be a reasonable accommodation. But that employee, unlike Miller, established that he had made diligent, good faith efforts to swap shifts, without result. *Id.* at *16. It was on that basis that *Berry* denied the employer's motion for summary judgment. *Id.*

*Tabura v. Kellogg USA*, 880 F.3d 544, 555 (10th Cir. 2018), cited by Miller, is similar. There was evidence that the plaintiff had tried and failed to arrange swaps, and had received no help from the employer. To be sure an entirely fruitless swap arrangement, accompanied by the employer's unwillingness to explore further alternatives, might fall short of a reasonable accommodation. But here, as I say, there is no evidence of that.

No dispute of fact like those in *Berry* or *Tabura* appears in the record of this case. As expressed above, Miller has not put forth competent evidence that he tried, but was unsuccessful, in getting a mutual swap, or that he ran out of vacation time. Nor did he document unsuccessful attempts with his employer, only to be fired.

Lurking in Miller's presentation is an assertion that Port Authority failed to engage in a required "interactive process" when it rejected his preferred request for an accommodation. In ADA cases, federal regulations require an interactive process, *i.e.,* a joint effort by the employer and the employee in determining an appropriate accommodation. 29 C.F.R. § 1630.2(o)(3). There is no such regulation under Title VII regarding religious accommodations. Courts

in this Circuit have not been consistent in this regard. *Dodd v. SEPTA*, 2008 U.S. Dist. LEXIS 56301, at *28 n.6 (E.D. Pa. July 23, 2008) (noting that Title VII does not have interactive process requirement); *Aldi*, 2008 U.S. Dist. LEXIS 25206, at *41 (imposing interactive process requirement in religious accommodation case). Still, the Title VII case law requires good faith and "bilateral cooperation," *see* p.23, *supra*, so I think that the absence of an interactive process could be relevant, if not determinative. I will consider it briefly.

Even under ADA standards, however, an employer is liable only if the lack of an interactive process constituted a lack of good faith and prevented the identification of an accommodation that was reasonable and available.[19] As expressed elsewhere in this opinion, there is no evidence of that. Moreover, there is considerable unrebutted evidence that the employer here did not brush off Miller's request, but carefully considered the relevant factors.

The Port Authority, and in particular McKeon, reviewed the USM schedules, past practices, the constraints of the MOA, and the potential impact on employee morale if certain employees were required to work additional weekends. (PSMF ¶¶26; DSMF ¶¶65, 66; *see* p. 11, *supra*). While she did not sit down with Lynch or Kosakowski and discuss the schedule, or determine that exact impact on particular staff members of granting Miller his preferred accommodation, this does not establish a lack of good faith. (PSMF ¶¶27-34). McKeon established without contradiction that she carefully considered Miller's preferred accommodation:

---

[19]     *Cf. Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 318 n.9 (3d Cir. 1999). In ADA cases, the interactive process imposes a duty of good faith on the employer in finding a reasonable accommodation. *See id.* at 315 ("The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome"); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 771 (3d Cir. 2004) (noting that, in order to establish that employer did not engage in interactive process, employee must prove that "employer did not make a good faith effort to assist the employee in seeking accommodations and . . . the employee could have been reasonably accommodated but for the employer's lack of good faith.").

We talked about redoing the schedule and seeing if we can come up with a line that would allow Fridays and Saturdays to be off. The problem with doing that is that if we did change the schedule, the way that the schedule get assigned is by seniority, and Gary would be the lowest person on the seniority ranking at that point in time, and he would be the last pick of line. My guess is that if we had a schedule that allowed Fridays and Saturdays to not be working, the lowest senior person would not get that line pick.

(DE 63-12, at 69:12-22). All of these actions speak to the employer's reasonable efforts to work out an appropriate accommodation. And the evidence shows that the employer did afford Miller a reasonable accommodation, which he failed to exploit.[20]

I recognize the importance, in any Title VII religious accommodation case, of considering the particular facts. I do not mean to suggest that any employer who offers mutual swaps or the use of accrued time has *per se* reasonably accommodated an employee. However, in light of the combined accommodation offered by Port Authority—shift swapping, and the use of vacation, personal excused, and compensatory time—I find that a reasonable accommodation was offered here. Miller has not raised an issue of material fact that the accommodation failed despite his cooperation—for example, that he made futile requests for mutual swaps, or that he did not have plenty of vacation time left to use for religious purposes. The undisputed facts of this case demonstrated that Port Authority offered Miller reasonable accommodations and that he failed to fully take advantage of them.

---

[20]     Miller devotes a couple of paragraphs to a contention that Port Authority "harassed" another Jewish employee, Leeor Solomon, after granting Solomon a religious accommodation. Citing no law, Miller cites Solomon's treatment as evidence of bad faith. (DBr at 40). It is true that a disparate-treatment claim can involve consideration of evidence of discrimination against others in the plaintiff's protected class. *See, e.g., Prise*, 657 F. Supp. 2d at 598 (considering elements of pretext and discriminatory intent). Miller's disparate-treatment claim has been dismissed, however, and he does not contest that dismissal. (DBr at 40 n.2). At any rate, Port Authority disputes Miller's allegations regarding Solomon, and has submitted evidence that Solomon was provided an accommodation, but was fired for abusing sick time, falsifying his time card, failing to provide notice when requesting time off, and circumventing his supervisor. (DE 77-1). The Port Authority asserts that this evidence is at best tangential to Miller's accommodation claim, and I agree.

Thus, I find that summary judgment is warranted on the issue of the reasonableness of the accommodation and Miller's cooperation with it.

### B. Undue Hardship

Typically, where a reasonable accommodation is found, "the statutory inquiry is at an end." *Ansonia*, 479 U.S. at 68. Nevertheless, in the alternative, I will briefly address the issue of undue hardship to the employer. Even accepting *arguendo* that Miller was not offered a reasonable accommodation, Port Authority has sustained its shifted burden to demonstrate that Miller's preferred accommodation would have imposed a more than *de minimis* burden on itself as employer.

The threshold of undue hardship is not high. *Webb*, 562 F.3d at 260 (citation omitted). An accommodation constitutes an "undue hardship" if it would impose more than a *de minimis* burden on the employer. *Hardison*, 432 U.S. at 84; *Webb*, 562 F.3d at 259-50. Such a burden may take the form of economic costs, but may also include non-economic costs, such as damage to employee morale or compromise of a collective bargaining agreement or seniority system.[21]

An analysis of undue hardship may not be based on mere speculation or conjecture. By the same token, however, "an employer is not required 'to wait until it [feels] the effects' of the proposed accommodation before determining its reasonableness." *Firestone Fibers & Textiles Co.*, 515 F.3d at 317 (citations omitted). "[E]mployers must be given leeway to plan their business operations and possible accommodative options in advance, relying on an accommodation's predictable consequences along the way." *Id.* If an accommodation would violate a CBA or impose more than a *de minimis* impact on co-workers, "then [the employer] is not required to offer the accommodation

---

[21] *EEOC v. Geo Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) (citing *Webb*, 562 F.3d at 260). *Accord United States v. Bd. of Educ.*, 911 F.2d 882, 887 (3d Cir. 1990) (citing *Hardison*, 432 U.S. at 79-83); *see also EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988) ("Cost cannot always be measured in terms of dollars."), *cert. denied*, 489 U.S. 1077, 109 S. Ct. 1527, 103 L. Ed. 2d 832 (1989).

under Title VII." *Id.* (citing *Balint v. Carson City*, 180 F.3d 1047, 1054-55 (9th Cir. 1999)).

Since *Hardison*, courts have uniformly held that compromise of a seniority system or violation of a collective bargaining agreement is a cognizable form of undue hardship.[22] Such an accommodation may create an undue hardship "if it causes more than a *de minimis* impact on co-workers," as many cases have recognized. A few are set out in the margin.[23]

---

[22]     *Fouche v. N.J. Transit*, 470 F. App'x 96, 96-97 (3d Cir. 2012) (affirming grant of summary judgment where accommodation would have caused undue hardship on employer by causing breach of seniority provision in collective bargaining agreement); *cf. US Airways, Inc. v. Barnett*, 535 U.S. 391, 403, 122 S. Ct. 1516, 1524 (2002) ("an employer need not adapt to an employee's special worship schedule as a 'reasonable accommodation' where doing so would conflict with the seniority rights of other employees.").

[23]     *Harrell v. Donahue*, 638 F.3d 975, 980 (8th Cir. 2011) (providing postal worker with Saturdays off would have burdened co-workers with more weekend work). *See also Aron v. Quest Diagnostics, Inc.*, 2005 U.S. Dist. LEXIS 49245, at *1 (D.N.J. June 30, 2005) (granting summary judgment for employer where plaintiff, who was not hired as phlebotomist which required two Saturday shifts per month, because accommodation would have created undue burden on existing employees to work more Saturdays), *aff'd*, 174 Fed. App'x 82, 83 (3d Cir.) (recognizing that proposed accommodation would constitute undue hardship, in part, because it "would result in unequal treatment of the other employees and negatively affect employee morale."), *cert. denied*, 549 U.S. 973 (2006). In particular, impairing the rights of co-workers under an established scheduling system may constitute an undue hardship. *Aron*, 174 F. App'x at 83. *See also Lee*, 22 F.3d at 1022-24 (noting that employer is not required to assign another employee to perform plaintiff's duties, which would have resulted in alteration of employees' time off); *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 274 (5th Cir. 2000) ("[t]he mere possibility of an adverse impact on co-workers as a result of 'skipping over' [an employee in a scheduling system] is sufficient to constitute an undue hardship" (citation omitted)); *Eversley v. MBank Dall.*, 843 F.2d 172, 176 (5th Cir. 1988) (holding that it was undue hardship to require employer to force employees to permanently switch shifts); *Prise*, 657 F. Supp. 2d at 599-600 (stating that "courts have consistently held that Title VII does not require an employer to force other employees to work on a particular day in order to accommodate a specific employee's desire to observe a religious holiday or Sabbath"); *Sanchez-Rodriguez*, 728 F. Supp. 2d at 43-44 (finding that proposed accommodation "to disrupt . . . neutral scheduling system" and give Sabbath employee every Saturday off would be undue burden because other employees would have to cover plaintiff's Saturday shift); *Vaughn v. Waffle House, Inc.*, 263 F. Supp. 2d 1075, 1085 (N.D. Tex. 2003) (holding that "Title VII does not require an employer to impose additional responsibilities on an employee's coworkers in accommodating that employee's religious beliefs" by requiring other employees to work employee's weekend shift); *Rojas*, 254 F. Supp. 3d at 297

39

Miller proposed two accommodations: (1) creating a special schedule for him so that he did not ever have to work on the Sabbath or holidays (*i.e.,* effectively removing him from the rotating schedule); or (2) keeping him on the rotating shift schedule, but treating each of his absences like other employee absences, as in the case of illness. These accommodations could not be implemented without imposing a more than *de minimis* hardship, primarily in the form of disruption of a collective bargaining agreement and other employees' rights thereunder.

Unit 329 is a twenty-four-hour, seven-days-a-week operation. Permanent tour assignments are picked based on seniority. The current rotational schedule, with its accompanying lines, is a past practice that is protected by the collective bargaining agreement. Under that arrangement, the USMs annually select the line that they would like to work, with preference given in accordance with their seniority.[24]

Creating a new schedule specifically for Miller, without first offering that schedule to the more senior USMs, would violate the MOA. It would have required Port Authority to remove other USMs from the line to which they were entitled by seniority, and forced those USMs to work less desirable lines than the ones they chose. Hogan, the union representative, certified that if Port Authority had created such a new schedule specifically for Miller, and if that schedule had resulted in other employees' being subjected to additional Friday and Saturday shifts, he would have filed a labor grievance. (DE 63-11). That threat is more than plausible.

Such an accommodation, then, would represent more than a *de minimis* hardship. Numerous courts have so held, and examples are cited in the

---

(finding undue hardship if employer was required "to change its scheduling system" because "other employees would be required to work more often during the weekend").

[24]    The four most senior USMs also typically pick the four prized "regular" tours, *i.e.*, the only ones that do not require rotation.

margin.[25] Those cases do not, as Miller does, concentrate on the cost of the accommodation in relation to the employer's budget, or speculate that if every other employee in the unit were compelled to pitch in, each could take on a relatively small number of the plaintiff's shifts. (DBr at 26-27). Rather, those courts have found it sufficient, on summary judgment, that the employer would be placed in the position of committing a substantial violation of a collective bargaining agreement and that the co-employees would be forced to sacrifice seniority rights.

Because granting Miller's preferred accommodation would have necessarily involved a breach of the union agreement and violated other employees' seniority rights, as well as potentially undermined morale and embroiled the company in grievance proceedings, Port Authority has established a hardship that is more than *de minimis*. For this independent reason, Port Authority is entitled to summary judgment.

---

[25]  *See Fouche v. N.J. Transit Corp.*, 2011 U.S. Dist. LEXIS 76437, at *11 (D.N.J. July 11, 2011) (holding employer satisfied undue burden where "[a]ccommodating [plaintiff] by giving him his Sabbath off would require NJ Transit to violate the seniority system established by the CBA. Unilaterally granting Fouche this accommodation would divert work that other operators, with greater seniority, were entitled to pick."); *Harrell*, 638 F.3d at 980 (finding undue burden where employee "effectively asked for the [employer] to make a unilateral change to his bid position so that he would operate under a fixed schedule rather than a rotating one."); *Moore v. A.E. Staley Mfg. Co.*, 727 F. Supp. 1156, 1162 (N.D. Ill. 1989) (granting summary judgment where forcing employer to "refrain from scheduling [employee] on Saturdays would also impose undue hardship on [employer's] other employees [because] other employees would be required to work a disproportionate number of Saturdays," which also violated seniority, bidding and various other provisions of the collective bargaining agreement); *Krushinski v. Roadway Express, Inc.*, 626 F. Supp. 472, 475 (M.D. Pa. 1985) (granting summary judgment because "[t]o have accommodated plaintiff's needs [employer] would have been required to ignore seniority provisions of the contract[.] Under this seniority system, [employer] was not free to let plaintiff have time off from sundown Friday to sundown Saturday unless every other employee with more seniority was first offered the same opportunity.")

## IV. Conclusion

For all of these reasons, Port Authority's motion for summary judgment is granted. An appropriate Order will be entered.

Dated:     Newark, New Jersey
              November 13, 2018

**KEVIN MCNULTY**
**United States District Judge**